# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MICHAEL BELEY AND DOUGLAS MONTGOMERY, *individually and for a class*, | Case No. 12-cv-9714 |
| Plaintiffs, | |
| v. | Judge John Robert Blakey |
| CITY OF CHICAGO, | |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On December 6, 2012, Plaintiffs Michael Beley and Douglas Montgomery, homeless sex offenders residing in the City of Chicago, filed suit against the city on behalf of themselves and a putative class of other homeless sex offenders. Plaintiffs alleged that Defendant's sex offender registration procedures, as applied to homeless offenders, violated: (1) procedural due process (Count I); (2) equal protection (Count II); (3) freedom of intimate association (Count III); and (4) the Illinois Sex Offender Registration Act (Count IV). On February 17, 2015, the Court dismissed Counts II and III with prejudice. Mem. Op. and Order [112]. On December 7, 2015, the Court certified the following class:

> All persons who attempted to register under the Illinois Sex Offender Registration Act with the City of Chicago from December 6, 2010 to the date of entry of judgment and who were not permitted to register because they were homeless.

Mem. Op. and Order [126] 15.  The Court designated Plaintiffs Michael Beley and Douglas Montgomery as the class representatives.  *Id*.

On September 20, 2016, Defendant moved for summary judgment on Plaintiffs' two remaining claims.  Def.'s Mot. Summ. J. [159].  On October 20, 2016, Plaintiffs cross-moved for partial summary judgment on Count I on the issue of liability.  Pls.' Mot. Summ. J. [164].  For the reasons stated below, Defendant's motion [159] is granted; Plaintiffs' motion [164] is denied.

## I.  Background

### A.  The Illinois Sexual Offender Registration Act

In Illinois, individuals convicted of certain sexual crimes must comply with rigorous reporting requirements under the Illinois Sexual Offender Registration Act ("SORA"), 730 ILCS 150/1 *et seq*.  Sex offenders must provide law enforcement comprehensive biographical information, including, *inter alia*:

> current address, current place of employment . . .
> telephone number, including cellular telephone number,
> the employer's telephone number, school attended, all e-
> mail addresses, instant messaging identities, chat room
> identities, and other Internet communications identities
> that the sex offender uses or plans to use, all Uniform
> Resource Locators (URLs) registered or used by the sex
> offender, all blogs and other Internet sites maintained by
> the sex offender or to which the sex offender has uploaded
> any content or posted any messages or information . . . a
> copy of the terms and conditions of parole or release
> signed by the sex offender and given to the sex offender by
> his or her supervising officer or aftercare specialist, the
> county of conviction, license plate numbers for every
> vehicle registered in the name of the sex offender, the age
> of the sex offender at the time of the commission of the
> offense, the age of the victim at the time of the

2

> commission of the offense, and any distinguishing marks
> located on the body of the sex offender.

730 ILCS 150/3(a).

Registration is made in person with the municipality in which the offender "resides or is temporarily domiciled for a period of time of 3 or more days." *Id*. at 150/3(a)(1). At the time of registration, the offender must provide "positive identification" and "documentation that substantiates proof of residence at the registering address." *Id*. at 150/3(c)(5). To register, an offender must also provide a current photograph, and may be required to provide fingerprint, blood, saliva, or tissue specimens. *Id*. at 150/8.

Following an offender's initial registration, SORA further imposes extensive update requirements. If an offender is temporarily absent from his registered address for three or more days, for example, he must notify law enforcement and provide his travel itinerary. *Id*. Similarly, an offender must report, in person, within three days of beginning school, establishing a new residence, or obtaining or changing employment. *Id*. at 150/3(b), (d). If an offender starts attending an institution of higher education, he must not only register with the police department in the jurisdiction where the school is located, but also the school's public safety or security director. *Id*. at 150/3(a)(i)-(ii).

Aside from these specific reporting events, an offender must reregister at least annually, and the registering law enforcement agency may require him to appear, upon request, up to four more times per year. *Id*. at 150/6. Additionally, the offender is required to pay a $100 initial registration fee and a $100 annual

3

renewal fee (although the registering agency may waive the registration fee if it determines that the person is indigent and unable to pay). *Id.* at 150/3(c)(6).

Penalties for violating SORA are severe. Failure to register constitutes a Class 3 felony punishable by two to five years imprisonment. 730 ILCS at 150/10; 730 ILCS 5-4.5-40. Subsequent failures constitute Class 2 felonies punishable by three to seven years imprisonment. 730 ILCS 150/10; 730 ILCS 5-4.5-35. Moreover, in addition to any other penalty required by law, SORA mandates a minimum period of seven days' confinement in the local county jail and minimum fine of $500. 730 ILCS 150/10. Finally, a SORA violation will extend an offender's mandatory registration period by ten years. *Id.* at 150/7.

## B. Registration Within the City of Chicago[1, 2]

All sex offender registrations for Chicago residents occur with the Criminal Registration Section ("CRS") at the Chicago Police Department ("CPD") headquarters. DSOF [161] ¶ 6; PSOF [166] ¶ 1. When an offender arrives at CPD

---

[1] Case facts are taken from the parties' Local Rule 56.1 statements and accompanying exhibits. "DSOF" refers to Defendant's statement of undisputed facts [161], with Plaintiffs' responses [163] cited as "R. DSOF." "PSOF" refers to Plaintiffs' Local Rule 56.1 Statement of Facts [166], with Defendant's responses [172] cited as "R. PSOF."

[2] Defendant, citing Federal Rule of Civil Procedure 32(a)(8), objects to multiple Plaintiffs' exhibits on the grounds that they memorialize in-court and deposition testimony elicited in separate cases brought against the City of Chicago. R. PSOF [172] 2. Defendant argues that the issues raised in those cases were dissimilar from the issues raised here. *Id.*; *see* Fed. R. Civ. P. 32(a)(8) (requiring "the same subject matter between the same parties"). In a "proper case," however, "depositions from one case may be used at the summary judgment stage of another, even if Rule 32(a)(8)'s requirements are not met." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014). Under *Alexander*, "two conditions must be met for a case to be proper." *Id.* First, the deposition "must satisfy Rule 56's requirements for an affidavit or declaration—i.e., the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and the deponent is competent to testify on these matters." *Id.* (citing Fed. R. Civ. P. 56(c)(4)). Second, the depositions from the other case "must be part of 'the record' in the present case." *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)). Both requirements are met here. Defendant's objection, therefore, is overruled; the Court will consider Plaintiffs' contested exhibits.

4

headquarters, a registering official—typically a CPD officer—determines whether the offender satisfies SORA's myriad requirements, including those related to positive identification, proof of residence, and registration fees. PSOF [166] ¶ 18. If an offender satisfies SORA's prerequisites, he is registered; if not, he is turned away. CRS maintains a daily "Criminal Registration Log" that documents each registration attempt. In cases where an offender is denied registration, the registering official memorializes the reason for denial on the Criminal Registration Log in a box labeled, "Reason For Being Turned Away." *See, e.g.* PSOF [166] Ex. 2.

### C. SORA and Homelessness

The word "homeless" does not appear in SORA's statutory text. Notwithstanding SORA's demand for an offender's "current address" (and supporting documentation thereof), however, the statute *does* allow registration of offenders without a "fixed residence." 730 ILCS 150/3(a). "Fixed residence" is defined as any place that a sex offender resides for an aggregate period of time of five or more days in a calendar year. *Id*. at 150/2(I). Offenders without a "fixed residence" must report to their registering agency in person on a weekly basis. 730 ILCS 150/3(a). The registering agency must document each weekly registration, including each location where the person stayed during the past seven days. *Id*.

Plaintiffs allege that, despite this statutory exception, Defendant improperly engaged in a policy or widespread practice of refusing to permit homeless offenders to register every seven days. Second Am. Compl. [46]. The evidence offered by Plaintiffs is detailed below.

### 1. Class Representative Michael Beley

Class representative Michael Beley, a resident of Chicago, was convicted of a sexual crime requiring him to register as a child sex offender under SORA. DSOF [161] ¶ 1. At his deposition, Beley testified to the following: on November 19, 2012, Beley was released from Taylorville Correctional Center and spent the night "on the streets" of Chicago. DSOF [161] ¶ 11; PSOF [166] ¶ 3. On the morning of November 20, 2012, Beley reported to CPD headquarters to complete his sex offender registration. DSOF [161] Ex. 6; PSOF [166] ¶ 3. Upon arrival, Beley was informed by Officer Christopher Meaders that he required "an ID with a fixed address" in order to register. DSOF [161] Ex. 2 at 39:14-15; PSOF [166] Ex. 5. Beley did not possess an identification card with a fixed address. DSOF [161] Ex. 2 at 39:21-40:20. As a result, Beley was not registered. *Id*. at 40:21-41:6. In the CRS Criminal Registration Log, Officer Meaders notated Plaintiff's "Reason For Being Turned Away" as "PROOF OF ADD." DSOF [161] Ex. 6.

Beley attempted to register again on November 23, 2012. PSOF [166] ¶ 5. Once again, Beley was denied, although Beley did not testify to the specific reason for his rejection. *Id*.; DSOF [161] Ex. 2. The parties agree, however, that CPD officers directed Beley to potential shelter options. PSOF [166] ¶ 5. The Criminal Registration Log for that day notes the "Reason For Being Turned Away" as "NO ID/REF SHELT." PSOF [166] Ex. 2.

Between November 23, 2012 and November 28, 2012, Beley obtained a state identification card displaying his son's Chicago address. DSOF [161] ¶ 12. On

November 28, 2012, Beley attempted to register for a third time. *Id*. Officer Meaders denied Beley's registration because his son's address fell within 500 feet of a school, park, or playground. *Id*.; *see* 720 ILCS 5/11-9.3 (prohibiting child sex offenders from knowingly residing within 500 feet of a school building, public park, playground, child care institution, or day care center). Officer Meaders wrote "ZONE" in the Criminal Registration Log. DSOF [161] Ex. 7.

Throughout this time, Beley remained homeless. DSOF [161] ¶ 13. Sometime during the week of December 3, 2012, Beley was classified as "non-compliant" on the Illinois State Police sex offender website. PSOF [166] Ex. 1 ¶ 18.

On December 6, 2012, Beley secured a spot at a homeless shelter at 200 South Sacramento Boulevard. DSOF [161] ¶ 13. On December 7, 2012, Beley obtained a state identification card with the shelter address. *Id*. Beley successfully registered at CPD headquarters on December 11, 2012. PSOF [166] Ex. 1 ¶ 19.

Between December 2012 and December 2013, Beley resided on a nightly basis at the shelter at 200 South Sacramento Boulevard. *See* DSOF [161] ¶¶ 13-14. Beley left the shelter in January 2014 after it was declared off limits to child sex offenders. *Id*. ¶ 15. Since his eviction, however, Beley has successfully registered at CPD headquarters on a weekly basis as an offender without a fixed residence. *Id*.; DSOF [161] Ex. 2 at 73:3-74:3.

## 2. Class Representative Douglas Montgomery

Class representative Douglas Montgomery, also a resident of Chicago, has also been convicted of a sexual crime requiring him to register under SORA. DSOF

[161] ¶ 2.  Montgomery was last released from confinement on January 21, 2011.
*Id.* ¶ 16.  At the time of his release, Montgomery signed a SORA Notification Form
acknowledging his duty to register within three days of his discharge.  PSOF [166]
Ex. 4.  The Notification Form included fill-in boxes for biographical information,
including Montgomery's resident address upon release.  *Id.*  Montgomery's
Notification Form specifically listed his intended resident address as "HOMELESS"
in the City of Chicago.  *Id.*

On January 27, 2011, Montgomery went to CPD headquarters to register as a
sex offender.[3]  PSOF [166] ¶ 10.  Montgomery testified at his deposition that, upon
arrival, he gave Officer Eric Chapman his Notification Form listing his resident
address as "HOMELESS."  DSOF [161] Ex. 9 at 73:15-23, 75:14-15.  Montgomery
further testified that Officer Chapman asked Montgomery where he was living, and
Montgomery replied, "I am homeless, I [have] been homeless for a long time."  *Id.* at
74:13-15.  Montgomery testified that the official informed him that CPD was "not
registering homeless people right now" and that Montgomery needed a "fixed
address" and an identification card, as well as the $100 registration fee.  *Id.* at
74:15-19, 76:12-21.  Montgomery departed CPD headquarters and did not return.
DSOF [161] ¶ 20.  In the Criminal Registration Log, Officer Chapman notated
Montgomery's "Reason For Being Turned Away" as "NEEDS ADDRESS."  DSOF

---

[3] Between January 22, 2011 and January 27, 2011, Montgomery was hospitalized for reasons not
relevant to the pending motions.  PSOF [164] Ex. 9.

[161] Ex. 10.[4]  In July 2011, Montgomery was arrested and charged with a SORA violation.  DSOF [161] ¶ 20.

### 3.     Members of Certified Class

In addition to the depositions of the class representatives, the record before the Court contains affidavits from five other members of the certified class: Adarryll Kelly, Charles Mowder, James McDonald, Kenneth Williams, and Henry Hartage.  PSOF [166] Ex. 6 at 7-10; Pls.' Mot. Certify Class [117] Ex. 4.  Kelly states that in November 2010 and on October 29, 2013, he went to CPD headquarters to register as homeless, but was told by a registering official that homeless registration was not permitted.  PSOF [166] Ex. 6 at 8.  Kelly further states, however, that he *did* successfully register as homeless at CPD headquarters on October 22, 2013.  *Id.* Mowder alleges that he was denied homeless registration "in an around 2010."  *Id.* at 9.  McDonald claims that he was denied homeless registration in March 2012. *Id.* at 10.   Williams *did* successfully register as homeless on November 1 and November 8, 2013, but was allegedly denied homeless registration on November 15, 2013.  Pls.' Mot. Certify Class [117] Ex. 4.  Hartage states that he was instructed by a CRS representative in September 2012 that he would be compliant with SORA if he stayed at the 200 South Sacramento shelter.  *Id.* at 7.

---

[4] Montgomery's actual name does not appear on the January 27, 2011 Criminal Registration Log; rather, Montgomery was recorded under the name "Douglas McArthur."  DSOF [161] Ex. 10.  The parties do not dispute, however, that the entry applies to Montgomery.  *See* DSOF [161] ¶ 18; PSOF [164] ¶ 10.

### 4.  Other Purported Evidence

Plaintiffs also point to other specific entries in the Criminal Registration Logs as further instances of CRS refusing to permit homeless offenders to register without a fixed residence:

| Name of Offender | Date of Attempted Registration | "Reason For Being Turned Away" |
|---|---|---|
| Albert Bingham | April 18, 2011 | ID HAS WRONG ADDRESS NO PROOF ADD |
| Davin Tangrio | May 13, 2011 | HOMELESS [sic] – NEEDS ID |
| Jemiah Gholson | January 7, 2012 | NEEDS ID |
| Johnathan Collantes | April 2, 2012 | PROOF OF ADD |
| Eric Flowers | March 27, 2012 | BAD ADD |
| Sean Messer | May 15, 2012 | NEEDS ID/HOMELESS |
| Keith Frierson | June 29, 2012 | NEEDS ID |
| Arthur Jones | August 15, 2012 | HOMELESS SHLTR NO PROOF ADD |
| Eric Williams | September 14, 2012 | NO PROOF ADD |
| Dwight Barkley | October 24, 2012 | NEEDS ID SHELTER |
| John Trotter | October 31, 2012 | HOMELESS/REF TO SHL |
| Timothy Downs | January 28, 2013 | NEEDS PROOF ADD |

PSOF [166] ¶¶ 36-44. Plaintiffs highlight that, shortly after their denial, eight of these offenders[5] obtained identification cards reflecting an address of 200 South Sacramento. *Id.* Almost immediately thereafter, they successfully registered at CPD headquarters. *Id.* Defendant does not dispute these Criminal Registration Log entries, but denies that they prove denial of homeless registration. R. PSOF [172] ¶ 42.

In addition to these specific instances, Plaintiffs cite general statistics derived from Criminal Registration Logs over time. Plaintiffs claim that, overall, the logs show that "few people were registered as lacking a fixed residence at the

---

[5] Bingham, Collantes, Downs, Flowers, Frierson, Gholson, Messer, and Williams.

time of registration," while CRS "routinely turned away sex offenders for failure to provide proof of address and for lack of identification." Pls.' Mot. Summ. J. [164] 5. Plaintiffs also allege that the overall number of sex offenders who registered without a fixed residence dramatically increased after June 2014, when CRS stopped requiring government issued identification to establish positive identification. *Id.* at 6; *see* 730 150/3(c)(5). According to Plaintiffs, 378 offenders were registered as homeless as of February 13, 2017. Pls.' Mot. Supp. Summ. J. Briefing [176].

Finally, at all times relevant to the present litigation, Sergeant Philip Jones served as Commanding Officer of CRS. PSOF [166] Ex. 11 at 7:22-8:5. During a deposition in a separate case, Jones testified that "every" registering sex offender "needs a proof of address." PSOF [166] Ex. 11 at 241:6-7. Jones also testified that a "threshold question for every individual who registered," was that they "must have a government-issued ID in order to prove they reside in Chicago." PSOF [166] Ex. 3 at 122:3-6. In the present litigation, however, Jones testified that this policy does not apply to individuals lacking a fixed address. *See, e.g.* PSOF [166] Ex. 16 at 18:11-18.

## II. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court "is not required to grant summary judgment as a matter of law for either side when faced with cross-motions for summary judgment." *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) (citing *Market St. Assocs. Ltd. P'ship v. Frey,* 941 F.2d 588, 590 (7th Cir. 1991)). Rather, the court must "evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant." *Id.*

## III. Analysis

Two causes of action from Plaintiffs' Second Amended Complaint [46] are still before the Court: (1) violations of Plaintiffs' procedural due process rights under 42 U.S.C. § 1983 (Count I); and (2) violations of SORA (Count IV). Defendant moves for summary judgment on both counts. Def.'s Mot. Summ. J. [159]. In response, Plaintiffs "acquiesce in judgment on their state law claim." Pls.' Mot. Summ. J. [164]. As a result, Defendant's Motion for Summary Judgment [159] is granted as it relates to Count IV, leaving Count I as Plaintiffs' sole remaining claim.

Plaintiffs not only contest Defendant's motion as it relates to Count I, but contend that they are entitled to summary judgment as to liability. *Id.* The parties levy multiple arguments in support of their respective motions. The Court's ruling, however, turns upon one dispositive issue: whether Plaintiffs present sufficient

12

evidence of a "policy" or "custom" on the part of Defendant to support municipal liability.

Under the Supreme Court's ruling in *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690-91 (1978), although a local governmental unit is subject to suit under 42 U.S.C. § 1983, *respondeat superior* will not suffice to impose liability. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). The municipality's *policy*, not employees, must be the source of the discrimination. *Id.*; *Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir. 1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). In other words, "a municipality can be liable under Section 1983 only for acts taken pursuant to its official policy, statement, ordinance, regulation or decision, or pursuant to a municipal custom." *Mootye v. Dotson*, 73 F. App'x 161, 171 (7th Cir. 2003); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by municipal policymakers.") (quotations omitted).

An official policy or custom may be established by means of: (1) an express policy; (2) a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy; or (3) the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation. *Rice*, 675 F.3d at 675; *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Here, the parties do not argue a constitutional deprivation

13

by a person with final decision-making authority. Instead, they focus upon the "express policy" and "widespread practice" prongs of *Monell's* municipal liability test. *See* Pls.' Mem. Supp. Mot. Summ. J. [165] 1 ("Plaintiffs challenge the Chicago Police Department's *express policy* to deny registration . . . to persons lacking a fixed residence or a *widespread practice* that produced an equivalent result.") (emphasis added). Therefore, to survive summary judgment, Plaintiffs must demonstrate a genuine issue of material fact that the City of Chicago had a policy or custom of denying SORA registration to sex offenders merely because they lacked a fixed residence at the time of registration.

The express policy theory applies, as the name suggests, "where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). The *Calhoun* court provided the following example:

> [I]f [a county jail] had a policy that directed the sheriff's personnel to throw away all prescription medications brought in by detainees or prisoners without even reading the label and without making alternative provisions for the affected individuals, the County would be liable assuming that such a policy would, on its face, violate the Eighth Amendment (or the Due Process clause, for pre-trial detainees).

*Id.* Under this type of claim, "one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id.* at 379-80.

In contrast, widespread practices "are not tethered to a particular written policy." *Id.* at 380. In these situations, "the claim requires more evidence than a single incident to establish liability." *Id.* Under this prong, the Seventh Circuit has declined to adopt "any bright-line rules" defining a "widespread custom or practice."

14

*Thomas*, 604 F.3d at 303. There is "no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three." *Id.*; *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("[T]he isolated act of an employee generally is not sufficient to impose municipal liability."); *Palka v. City of Chicago*, 662 F.3d 428, 435 (7th Cir. 2011) ("[T]wo alleged instances of discrimination do not constitute a widespread pattern or practice."); *Estate of Moreland v. Dieter,* 395 F.3d 747, 760 (7th Cir. 2005) ("[Three] incidents do not amount to a widespread practice that is permanent and well settled so as to constitute an unconstitutional custom or policy about which the sheriff was deliberately indifferent."). The Seventh Circuit has also found four instances to be inadequate. *See, e.g. Grieveson v. Anderson,* 538 F.3d 763, 773 (7th Cir. 2008); *Jenkins v. Bartlett*, 487 F.3d 482, 493 (7th Cir. 2007).

Beyond these low numerical thresholds, however, the precise boundaries of "widespread customs" remain flexible. This lack of precision is understandable. Unless the number of supposed unconstitutional acts is so exceedingly small that an absence of custom is facially apparent, mere quantity, standing alone, tells very little. Municipal activity does not occur in a vacuum. Thus, in addition to the sheer volume of improper conduct at issue, other probative factors must be considered, including, *inter alia*, the period of time alleged, number of municipal actors involved, and opportunities for the alleged custom to manifest itself. These variables, unique to each case, impact the relative import of the number of constitutional violations alleged. The number of alleged incidents, for example,

15

carries different meaning depending on whether the incidents occur over the course of days, weeks, or years. *See Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) (noting that plaintiff's alleged incidents occurred "in a period of one year"). Significance may be further impacted by frequency, *i.e.*, the *rate* of alleged unconstitutional behavior relative to lawful activity. *See Gable v. City of Chicago,* 296 F.3d 531, 538 (7th Cir. 2002) (comparing number of alleged improper incidents with total number of incidents). In short, the Court must evaluate each distinct case by examining the totality of the circumstances.

Furthermore, in conducting this analysis, the Court must not lose the forest for the trees. Ultimately, the challenge is to "distinguish between systemic problems showing official deliberate indifference and occasional lapses that are inevitable in well-run institutions." *Thompson v. Taylor*, No. 13-cv-6946, 2016 WL 5080484, at *7 (N.D. Ill. Sept. 20, 2016). The gravamen "is not *individual* misconduct by police officers (that is covered elsewhere under § 1983), but a *widespread practice* that permeates a critical mass of an institutional body." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (first emphasis added). In other words, *Monell* claims must focus "on institutional behavior." *Id.* As a result, "misbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole." *Id.* In effect, Plaintiffs must show that the unlawful practice "was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). That is, Plaintiffs must

present facts "showing that policymakers knew of the conduct or that the conduct was so widespread that they should have known." *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 818 (7th Cir. 2001).

Here, even when viewed in the light most favorable to Plaintiffs, the evidence before the Court fails to raise a genuine issue of fact with respect to whether CRS personnel acted pursuant to an official policy or practice regarding the registration of homeless sex offenders. At most, Plaintiffs present evidence of the following instances from which a reasonable fact finder might deduce unconstitutional behavior:

| Name of Offender | Date of Attempted Registration |
|---|---|
| Charles Mowder | 2010 |
| Adarryll Kelly | November 2010 |
| Douglas Montgomery | January 27, 2011 |
| James McDonald | March 2012 |
| Henry Hartage | September 2012 |
| Michael Beley | November 20, 2012 |
| Michael Beley | November 23, 2012 |
| John Trotter | October 2012 |
| Adarryll Kelly | October 29, 2013 |
| Kenneth Williams | November 2013 |

Adarryll Kelly's November 2010 denial, however, falls outside the scope of the certified class. *See* Mem. Op. and Order [126] 15 (certifying class from December 6, 2010 onward). Similarly, Plaintiffs fail to provide specificity regarding *when* Charles Mowder was allegedly denied homeless registration in 2010. Consequently, the Court cannot conclude that his registration attempt falls within the certified time period.

Regardless, Plaintiffs' proffered instances remain spread across three complete calendar years. Only two instances occurred in 2010; one in 2011; five in 2012; and two in 2013. These numbers pale in comparison to the total number of registrations regularly handled by CRS. In January 2011 alone, CRS completed 389 sex offender registrations; and it completed 478 in January 2012. PSOF [166] Ex. 17, 21. It is safe to infer, therefore, that CRS easily compiles thousands of registrations every year. When multiplied over Plaintiffs' three year timespan, the ostensible number of total registrations equals more than 10,000, a figure 1,000 times greater than Plaintiffs' number of alleged violations. This places Plaintiffs' claim of a "widespread" custom or practice in harsh perspective. *See Gable,* 296 F.3d at 538.

These figures, of course, consider *all* Chicago sex offenders seeking registration, not merely those without a fixed residence. Viewing Plaintiffs' evidence from that perspective, however, only further undermines their case, because Plaintiffs' purported violations are interspersed with an equal number of occasions where homeless offenders *were* registered without a fixed residence. Indeed, many of these instances involve the *same* offender who, according to Plaintiffs, was rejected on other occasions as a result of a widespread practice.

For example, Adarryll Kelly claims that CRS informed him on October 29, 2013 that homeless registration was not permitted. PSOF [166] Ex. 6 at 8. Kelly admits, however, that he *did* successfully register as homeless just one week earlier, on October 22, 2013. *Id.* Similarly, Kenneth Williams claims he was denied

homeless registration on November 15, 2013, but acknowledges that he successfully registered as homeless on both November 1 and November 8, 2013. Pls.' Mot. Certify Class [117] Ex. 4. Plaintiffs rely heavily on the experiences of Michael Beley in November 2012, but admit that Beley has successfully registered as an offender without a fixed residence since January 2014. DSOF [161] ¶¶ 15.

Plaintiffs also point to Douglas Montgomery's experience in January 2011. That same month, however, CRS permitted weekly registration by James Manegold, another homeless sex offender, four times. PSOF [166] Ex. 17. Likewise, James McDonald was allegedly denied registration in March 2012, but James Manegold *did* register as homeless on April 11, 2012. PSOF [166] ¶ 22; PSOF [166] Ex. 22 at 7. Henry Hartage was allegedly referred to the shelter at 200 South Sacramento in November 2012. *Three* offenders—Ginn Torres, James Manegold, and Paul Herbert—successfully completed homeless registration on August 6, 28, and 29, 2012 respectively. PSOF [166] Ex. 23. John Trotter was allegedly denied homeless registration in October 2012. That same month, CRS registered James Manegold as homeless five times and registered Paul Herbert as homeless four times. PSOF [166] Ex. 24.

The remainder of Plaintiffs' proffered evidence is equally unavailing. Plaintiffs point, for example, to the attempted registrations of Albert Bingham, Johnathan Collantes, Timothy Downs, Eric Flowers, Keith Frierson, Jemiah Gholson, and Eric Williams. Plaintiffs, however, merely proffer: (1) a Criminal Registration Log documenting the initial failed registration attempt; (2) an

identification card issued shortly thereafter reflecting an address of 200 South Sacramento; and (3) a subsequent SORA registration form reflecting 200 South Sacramento as the offender's resident address. As an example, the CRS Criminal Registration Log indicates that Albert Bingham was turned away on April 18, 2011 for "ID HAS WRONG ADDRESS NO PROOF ADD." PSOF [166] Ex. 30 at 1. On April 19, 2011, Bingham was issued a state identification card reflecting an address of 200 South Sacramento. *Id.* at 8. Later that day, CRS registered Bingham, listing his resident address as 200 South Sacramento. *Id.* at 2-3.

Such evidence, without more (and there is no more here), does not support a reasonable inference that Defendant denied registration to Bingham because he lacked a fixed residence. Indeed, Plaintiffs submit no evidence that Bingham, in fact, lacked a fixed residence on April 18, 2011. If anything, the evidence indicates the opposite: that Bingham *did* have a fixed residence—at least as that term is defined under SORA—at 200 South Sacramento. That being the case, Bingham was required to comply with SORA's proof of residence requirement. *See* 730 ILCS 150/3(c)(5) (requiring "documentation that substantiates proof of residence at the registering address"). Lacking such documentation, Bingham was properly denied registration on *that* basis, not on the purported basis of homelessness.

Plaintiffs' forms of proof for Collantes, Downs, Flowers, Frierson, Gholson, Messer, and Williams mirror Bingham, the sole exception being the precise language employed in the "Reason Being Turned Away" portion of the Criminal Registration log. The log entries for Collantes, Frierson, and Gholson for example,

20

list "NEEDS ID" as the "Reason For Being Turned Away"; Downs' log entry states "NEEDS PROOF ADD"; Flowers' entry states "BAD ADD"; Williams' entry states "NO PROOF ADD." PSOF [166] Ex. 30. These semantics aside, Plaintiffs' proof issues remain the same. Such evidence does not establish that each offender lacked a fixed residence at the time of their failed registration attempt, or that such offender was denied registration on that basis.

Plaintiffs' reliance on the attempted registrations of Arthur Jones, Sean Messer, Dwight Barkley, and Davin Tangrio is similarly flawed. The Criminal Registration Log for these individuals simply lists the "Reason For Being Turned Away" as "HOMELESS SHLTR NO PROOF ADD," "NEEDS ID/HOMELESS," "NEEDS ID SHELTER," and "HOMLESS [sic] – NEEDS ID," respectively. *Id*. Once again, it would be unreasonable to infer, from these entries alone, that these offenders were denied registration because they, in fact, lacked a fixed residence. "NEEDS ID" or "NO PROOF ADD" is not the same as "NEEDS ADDRESS." To the contrary, the reasonable inference is that these individuals were properly denied registration due to their failure to provide proof of residence or positive identification. *See* 730 ILCS 150/3(c)(5) (requiring "positive identification" and "documentation that substantiates proof of residence at the registering address").

Plaintiffs' general statistical theories fare no better. The basic fact that, over time, CRS "routinely turned away sex offenders for failure to provide proof of address and for lack of identification," is irrelevant; that is precisely what SORA demands. *See* Pls.' Mot. Summ. J. [164] 5. Plaintiffs do not facially challenge the

constitutionality of SORA's positive identification or proof of residence requirement generally. *See* 730 150/3(c)(5). Rather, Plaintiffs' due process claim is supported only where CRS denied registration for failure to provide proof of an address that does not exist. Plaintiffs' statistics do not speak to that relevant scenario.

The increase in homeless registration after June 2014, when CRS altered its positive identification requirements, is also unsurprising. Any reduction in an offender's administrative burden will likely result in greater registration success, particularly for homeless offenders who are most in need of institutional resources. The decision to not require government issued identification, however, does not constitute a prior deliberate choice to deny registration due to an offender's lack of a fixed residence. *See Derfus v. City of Chicago*, No. 13 C 7298, 2015 WL 1592558, at *4 (N.D. Ill. Apr. 6, 2015) ("The fact that the City registered more offenders as not having a fixed residence or temporary domicile in two random time periods" in 2014, than "in two random time periods" in prior years, does "not suggest that the City had a policy of refusing to register offenders with that status.").[6]

Finally, the testimony of Sergeant Jones is, at best, inconclusive. In a separate civil case, Jones testified that "every" registering sex offender "needs a proof of address" and that a "threshold question for every individual who registered," was that they "must have a government-issued ID in order to prove

---

[6] In supplemental briefing, Plaintiffs also assert that the 378 offenders registered as homeless as of February 13, 2017 proves that homeless registration "was feasible during the class period." Pls.' Mot. Supp. Summ. J. Briefing [176] 2. Mere feasibility, however, is beside the point. To survive summary judgment, Plaintiffs must demonstrate a genuine issue of material fact that, during the class period, the City of Chicago had a policy or custom of denying SORA registration to sex offenders because they lacked a fixed residence at the time of registration. Without more, the sheer number of homeless offenders registered on a random date does nothing help satisfy this burden.

they reside in Chicago." PSOF [166] Ex. 3 at 122:3-6; Ex. 11 at 241:6-7. That case, however, focused on SORA's $100 fee requirement and CPD's fee waiver procedures, not the registration process for individuals without any fixed residence. The Court declines, therefore, to take Sergeant Jones' testimony out of context. Indeed, during his deposition in the *present* litigation, Jones repeatedly stated that the general proof of residence policy does not apply to individuals lacking a fixed address. PSOF [166] Ex. 16 at 14:20-23 ("We have a practice to register any person who's required to register that comes in to register irrespective of whether they claim to have a fixed address or not."), 18:11-18 ("We don't ask them to show us proof of address that they say they don't have."), 45:4-5, 97:17-19.

In sum, when viewed in the light most favorable to Plaintiffs, the evidence does not present a triable issue of fact regarding whether there was a policy or widespread practice of denying SORA registration to sex offenders who lacked a fixed address at the time of registration. This determination is consistent with at least one similar case in this district. *See Derfus*, 2015 WL 1592558, at *4 (finding no evidence of *Monell* policy and granting summary judgment on analogous facts). At most, Plaintiffs have shown "occasional lapses of judgment" or "individual misconduct by police officers," not "systemic problems" or "institutional behavior." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015); *Thompson v. Taylor*, No. 13-cv-6946, 2016 WL 5080484, at *7 (N.D. Ill. Sept. 20, 2016). This is not enough. As a result, under *Monell*, Plaintiffs cannot establish municipal liability on their

sole remaining claim against Defendant. Given this ruling, the Court need not address the various supplemental arguments raised by the parties.

## IV. Conclusion

Defendant's Motion for Summary Judgment [159] is granted. Plaintiffs' motion for partial summary judgment on the issue of liability as to Count I [164] is denied. The Clerk is directed to enter Rule 58 judgment in favor of Defendant and against Plaintiffs. Civil case terminated.


IT IS SO ORDERED

Dated: February 28, 2017                    Entered:

                                            John Robert Blakey
                                            United States District Judge